CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
NOV 22 2005
JOHN F. CORCORAN, CLERK
BY: DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| BEVERLY A. MULLINS,<br>    Plaintiff, | )<br>)<br>) Civil Action No. 2:04cv00055 |
| v. | )<br>) **MEMORANDUM OPINION** |
| JO ANNE B. BARNHARDT,<br>**Commissioner of Social Security**<br>    Defendant. | )<br>) BY: GLEN M. WILLIAMS<br>) Senior United States District Judge |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

The plaintiff, Beverly A. Mullins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Mullins filed her current application for DIB on or about October 19, 1998, alleging disability as of August 21, 1997, based on pulmonary problems, including bronchitis and pneumonia, and depression. (Record, ("R"), at 72-74, 87.) Her claim was denied initially and on reconsideration. (R. at 57-59, 60, 61-62.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 63.) This hearing was held on November 5, 1999, during which Mullins was represented by counsel. (R. at 37-48.)

By decision dated March 10, 2000, the ALJ denied Mullins's claim. (R. at 14-28.) The ALJ found that Mullins was insured for DIB purposes through the date of his decision. (R. at 18.) Furthermore, the ALJ found that Mullins had not engaged in substantial gainful activity since August 21, 1997. (R. at 18.) The ALJ found that Mullins suffered from a number of impairments, including a history of respiratory ailments, which resolved with treatment, a history of lymphoma, mild depressive disorder and mild anxiety disorder. (R. at 18.) The ALJ also found, however, that Mullins's impairments did not significantly limit her ability to perform basic work-

related activities. (R. at 18.) Therefore, the ALJ found that Mullins did not have a severe impairment and, thus, that she was not disabled under the Act. (R. at 18.) *See* 20 C.F.R. § 404.1520(g) (2005).

After the ALJ issued his opinion, Mullins pursued her administrative appeals, (R. at 9-10), but the Appeals Council denied her request for review. (R. at 6-7.) Mullins then filed an action seeking review of the ALJ's unfavorable decision. *See* 20 C.F.R. § 404.981 (2005). On January 22, 2002, in a Report and Recommendation issued by United States Magistrate Judge Pamela Meade Sargent, the court found that substantial evidence did not exist in the record to support the Commissioner's finding that Mullins did not suffer from a severe mental impairment and was not disabled. (R. at 305-07.) Judge Sargent recommended that the claim be remanded to the Commissioner for further development. (R. at 307.) I adopted the Report and Recommendation on February 14, 2002, and entered a Final Judgment and Order to that effect. (R. at 292-93.) A supplemental hearing was held before an ALJ on July 17, 2002, and another administrative hearing was held before a new ALJ on July 22, 2003, at both of which Mullins was represented by counsel. (R. at 554-94.)

By decision dated December 10, 2003, the ALJ again denied Mullins's claim. (R. at 281-89.) The ALJ found that Mullins was insured for DIB purposes through the date of his decision. (R. at 287.) Furthermore, the ALJ found that Mullins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 287.) The ALJ found that the medical evidence established that Mullins suffered from an impairment or a combination of impairments considered "severe" but found that these impairments did not meet or medically equal one of the listed impairments

-3-

in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 288.) The ALJ also found that Mullins's allegations regarding her limitations were not totally credible. (R. at 288.) The ALJ further found that Mullins had the residual functional capacity to perform light[1] work in a climate-controlled setting with no exposure to hazards, fumes, gases, noxious odors or crowds. (R. at 288.) Moreover, the ALJ found that Mullins was limited to simple, repetitive one- and two-step tasks in a low-stress nonsequential production environment where she would have infrequent exposure to the general public and only occasional exposure to co-workers and supervisors. (R. at 288.) The ALJ found that jobs that Mullins could perform were available in significant numbers, such as work as a tobacco sampler and surveillance system monitor. (R. at 288.) Thus, the ALJ found that Mullins was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 288.) *See* 20 C.F.R. § 404.1520(g) (2005).

After the ALJ issued his opinion, Mullins pursued her administrative appeals, (R. at 273-74), but the Appeals Council declined to assume jurisdiction. (R. at 270-72.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed April 7, 2005, (Docket Item No. 14), and Mullins's Memorandum In Opposition To Decision Of The Commissioner, filed February 3, 2005. (Docket Item

---

[1] The Social Security regulations define "light work" as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, she also can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b) (2005).

No. 11.)

## *II. Facts*

Mullins was born in 1960, (R. at 72), which classifies her as "a younger person" under 20 C.F.R. § 404.1563(c). Mullins has a high school education and past relevant work experience as an office assistant. (R. at 104, 108.)

At the supplemental hearing held on July 27, 2002, Mullins testified as to the changes in her condition since her first hearing before an ALJ. (R. at 557-66.) However, Mullins testified that there had been no change in the medical condition of her disabled child, and the child still required 24-hour care. (R. at 558, 560.) Mullins stated that she still provided care for the child, although she received help from her husband and an in-home care assistant. (R. at 558.) Mullins stated that the in-home care assistant worked six hours a day. (R. at 560.) Mullins further testified that she and her family had moved from Virginia to South Carolina, which had been emotionally disruptive to her. (R. at 557-59.) Mullins also testified that her son still had behavioral problems. (R. at 560.) Mullins stated the her husband home-schooled the children, but she only occasionally helped. (R. at 561-62.)

When asked why she could not work, Mullins testified that she did not think that she "could take the pressures anymore." (R. at 559.) Mullins testified that she took Zoloft, Xanax and another medication but that she could not afford to visit a psychiatrist. (R. at 558.) Mullins stated that she believed the medication helped, and she had not visited a psychiatrist since Dr. Catherine Page, M.D. (R. at 559, 563.)

At the administrative hearing held on July 22, 2003, Mullins testified that she had not worked since she filed for DIB in 1998, and she had stopped working at that time because of stress, a poor memory, problems getting along with staff and irritability. (R. at 572-74.) Mullins stated that her memory was still terrible, and she was concerned about it. (R. at 577.) Mullins further testified that she had been placed on Zoloft because she was "down" and could not function and had taken the drug for approximately eight or 10 years. (R. at 574.) While Mullins testified that she had been treated by a psychiatrist in early 2001, she said that she was not currently being treated by one. (R. at 588.) Mullins also stated that she took Wellbutrin and other medication for her sleep apnea. (R. at 574-75.) Mullins stated that her poor memory and irritability were the biggest impediments to working. (R. at 589.) Mullins further stated that she did not think that she could work because of her anxiety, difficulty dealing with people and slow reflexes. (R. at 589-90.)

In response to questions about her children, Mullins testified that her husband was primarily responsible for the care of their disabled child, and they no longer had a in-home care assistant for the child. (R. at 575-76.) Mullins stated that she provided no care for the child because she was not mentally capable. (R. at 576.) For her other children, Mullins testified that she tried to spend time with them. (R. at 585.)

When asked about her physical impairments, Mullins testified that she had a history of bronchitis that had started in her late teens. (R. at 576.) Mullins further testified that she had most recently had pneumonia in January 2003. (R. at 576.) For her bronchiectasis, Mullins testified that she took an antibiotic for one week every month. (R. at 576-77.) Mullins stated that her bronchial condition was irritated by

-6-

Case 2:04-cv-00055-GMW-PMS   Document 17   Filed 11/22/05   Page 6 of 18   Pageid#: 54

the rain, cleaning smells, certain perfumes, flowers, cigarette smoke, dog food and cat food. (R. at 577.)

When asked about her daily activities, Mullins stated that did chores, cleaned the house and watched television. (R. at 585.) Mullins testified that she did not cook or shop for groceries but that she traveled to Wal-Mart with her husband about once a month. (R. at 585-86.) Mullins also testified that she gardened in the spring and attended church services on Sunday and sometimes on Wednesday. (R. at 586-87.) Mullins stated that she was able to have decent relationships with parishioners. (R. at 587-88.)

David Allen Mullins, Mullins's husband, also testified at Mullins's hearing. (R. at 579.) He had worked with his wife and had personal knowledge as to the circumstances which caused Mullins to quit her employment. (R. at 579-80.) He testified that Mullins had quit her position because she sensed that she was going to be terminated for personality conflicts she was having with co-workers and patients. (R. at 580.) Regarding Mullins's emotional stability at the time she was working, her husband testified that she would have major mood swings and be unable to get along with others or control her emotions. (R. at 581.) He also testified that Mullins had a poor memory that had gotten progressively worse and sleep apnea. (R. at 581.) He further testified that Mullins saw a chiropractor, obstetrician/gynecologist, lung specialist and her family physician frequently for her physical problems. (R. at 582.)

He further testified that Mullins was unable to care for their disabled child or drive long distances. (R. at 582.) He stated,

-7-

> [Mullins] has gone from a person that's productive and able to be involved in society and able to be involved with other people, to a person that has withdrawn into herself, that doesn't get out hardly at all. And when she does, it's not the woman I married that was able to associate with people and had a personality that she could deal with people. She can't deal with people now.

(R. at 583-84.)

Arthur Schmitt, Ph.D., a vocational expert, was the next to testify at Mullins's hearing. (R. at 590.) Schmitt was asked to consider Mullins's past work experience and described the position of insurance clerk as "sedentary and semi-skilled." (R. at 590.) Schmitt was then asked to consider Mullins's age, education, past relevant work experience and residual functional capacity with the following limitations: no exposure to hazards; work in a climate-controlled setting; no concentrated exposure to fumes, gases and noxious odors; one- and two-step tasks in a low-stress non-sequential production environment; no exposure to crowds; infrequent exposure to the general public; and only occasional exposure to co-workers and supervisors. (R. at 590-91.) Schmitt testified that there were jobs in the regional or national economy that Mullins could perform such as tobacco sampler, where there were approximately 230 such jobs in the South Carolina economy and 4,014 in the national economy. (R. at 591.) Schmitt stated that Mullins also could perform the duties of a surveillance system monitor, and there were 540 of these jobs in the South Carolina economy and 155,000 nationally. (R. at 591.) Schmitt further found that Mullins could perform the duties of a telephone quotation clerk, and there were 490 of these jobs in the South Carolina economy and 44,100 in the national economy. (R. at 591.)

Schmitt admitted that the positions of telephone quotation clerk and surveillance system monitor would require considerable concentration, while the position of tobacco sampler would require some concentration. (R. at 592.) Schmitt also stated that a tobacco sampler would be exposed to some fumes but only from 12 leaves at a time. (R. at 592.) Schmitt stated that a severe, stressful emotional problem could interfere with all jobs if a person had to miss more than four days a month or had to take frequent breaks. (R. at 593.)

In rendering his decision, the ALJ reviewed medical records from Dr. Hossein Faiz and Associates, P.C.; Stone Mountain Health Services; Western Lee County Health Clinic; St. Charles Community Health Clinic; Dr. Robert Rosser, M.D.; Lee County Community Hospital; Dr. Syed Ahsen, M.D.; Dr. Karl W. Konrad, M.D., Ph.D.; Dr. Marshall D. Hogan, M.D.; Dr. Donald R. Williams, M.D.; J. Leizer, Ph.D.; Kingsport Hematology-Oncology; Southwest Virginia Regional Cancer Center; Howard S. Leizer, Ph.D.; Dr. Michael J. Hartman, M.D.; B. Wayne Lanthorn, Ph.D.; Southwest Virginia Psychiatric & Counseling Associates; Dr. C.W. Wimberly, M.D.; Women's Health Specialists, LLC; Lowcountry Lung and Critical Care, P.A.; and Summerville Medical Center.

The relevant facts up to January 22, 2002, that were in the record at time of the court's earlier report and recommendation were set forth in the court's earlier opinion. For brevity's sake, the court will adopt that recitation of the facts and will not repeat them here. Additional facts are recited below.

From November 1, 2001, to September 12, 2002, Mullins visited Dr. C.W.

Wimberly, M.D., for various concerns including knee pain, vertigo and her bronchial condition. (R. at 524-30.)

On July 3, 2002, Mullins visited Women's Health Specialists, LLC, for back pain and reported pain during intercourse. (R. at 550.) Dr. Karen M. Rodeffer Evans, M.D., assessed Mullins with pelvic pain and dyspareunia and prescribed Estrace and Estrace cream. (R. at 550.)

On October 17, 2002, Mullins submitted to Dr. Rodeffer Evans at Women's Health Specialists for a bone density evaluation. (R. at 549.) Dr. Rodeffer Evans assessed Mullins with advanced osteopenia and found that Mullins's fracture risk was approximately six times that of the standard population. (R. at 549.)

Mullins returned to Women's Health Specialists on November 13, 2002, and December 17, 2002, for symptoms associated with vulvodynia. (R. at 551.) Mullins was placed on Valisone. (R. at 551.)

On February 17, 2003, Mullins visited Trident Regional Medical Center for a follow-up for an abnormal CT scan. (R. at 535-36.) Changes were seen in Mullins's lungs that showed less centrilobular or intersititial nodularity and decreasing prominence of peripheral finding along the pleural surfaces, although some remained, particularly in the left lower lobe. (R. at 535.) The most prominent current finding was that there was continued thickening of Mullins's airway structures in the central thorax and dependent thorax suggesting bronchopneumonia. (R. at 535.)

On February 20, 2003, Mullins visited Lowcountry Lung and Critical Care, P.A., because of an abnormal CT scan performed the week before. (R. at 545.) A physical examination showed Mullins's lungs to be clear bilaterally. (R. at 545.) Dr. John M. Rucker, M.D., assessed Mullins with bronchiectasis, probably related to underlying asthma. (R. at 545.) Dr. Rucker began Mullins on cyclic antibiotics, prescribing Levaquin and Bactrim to be used alternatively at the beginning of every month. (R. at 545.)

On February 27, 2003, Mullins visited Women's Health Specialists for vulvodynia. (R. at 548.) Mullins reported that she had not noticed any improvement with the cream that she used last. (R. at 548.) Dr. Rodeffer Evans prescribed Diflucan and Lidocaine gel and discussed surgery. (R. at 548.)

On April 7, 2003, Mullins was tested at the Trident Sleep Lab at the Summerville Medical Center for complaints of excessive daytime sleepiness, snoring and witnessed apneas. (R. at 542.) The results of the overnight polysomnogram were adequate with a moderate increase in RDI with no REM sleep or PLMs noted; the SpO2 was adequate. (R. at 542.) The results of the CPAP titration study were adequate with successful CPAP titration noted. (R. at 543.) The SpO2 was adequate with no PLMs noted. (R. at 543.) In response to the results, it was recommended that Mullins diet and exercise and improve her sleep hygiene. (R. at 542-43.)

On April 21, 2003, Mullins was treated at Lowcountry Lung and Critical Care, P.A., for a follow-up for dyspnea and to rule out sleep apnea. (R. at 544.) The physical examination revealed that Mullins had clear lungs bilaterally without

-11-

Case 2:04-cv-00055-GMW-PMS   Document 17   Filed 11/22/05   Page 11 of 18   Pageid#: 59

significant wheezes, rales or rhonchi. (R. at 544.) Dr. Rahman Shah, M.D., assessed Mullins with bronchiectasis and a history of sleep apnea. (R. at 544.) Dr. Shah gave Mullins Bactrim and Levaquin to treat her bronchiectasis and talked with Mullins about initiating CPAP therapy for her sleep apnea. (R. at 544.)

On May 29, 2003, Mullins visited Women's Health Specialist, LLC, and was diagnosed with vulvodynia. (R. at 546-47.) Mullins was given Nortiptyline and counseled on her options, which included surgery. (R. at 547.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2004); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 10, 2003, the ALJ denied Mullins's claim. (R. at 281-89.) The ALJ found that Mullins was insured for DIB purposes through the date of his decision. (R. at 287.) Furthermore, the ALJ found that Mullins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 287.) The ALJ found that the medical evidence established that Mullins suffered from an impairment or a combination of impairments considered "severe" but found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 288.) The ALJ also found that Mullins's allegations regarding her limitations were not totally credible. (R. at 288.) The ALJ further found that Mullins had the residual functional capacity to perform light work in a climate-controlled setting with no exposure to hazards, fumes, gases, noxious odors or crowds. (R. at 288.) Moreover, the ALJ found that Mullins was limited to simple, repetitive one- and two-step tasks in a low-stress nonsequential production environment where she would have infrequent exposure to the general public and only occasional exposure to co-workers and supervisors. (R. at 288.) The ALJ found that jobs that Mullins could perform were available in significant numbers, such as work as a tobacco sampler and surveillance system monitor. (R. at 288.) Thus, the ALJ found that Mullins was not under a disability as defined by the

Act at any time through the date of the decision and not eligible for benefits. (R. at 288.) *See* 20 C.F.R. § 404.1520(g) (2005).

Mullins argues the ALJ's decision was not based on the substantial evidence of the record. (Plaintiff's Memorandum In Opposition To Decision Of The Commissioner, ("Plaintiff's Brief"), at 4-6.) Specifically, Mullins argues that the ALJ erred in discrediting her subjective allegations of disability and in failing to consider the combined effects of her conditions. (Plaintiff's Brief at 4-6.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from

-14-

a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Mullins argues that the ALJ erred in discrediting her subjective allegations of disability. (Plaintiff's Brief at 4-6.) I find that the ALJ considered Mullins's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment, which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers...

76 F.3d at 595.

-15-

I find that substantial evidence supports the ALJ's finding that Mullins's subjective complaints of disabling functional limitations were not credible. The ALJ properly considered the objective evidence of record and Mullins's daily activities in assessing her subjective complaints. (R. at 284.) The ALJ found that Mullins's activities, which included watching television, making her bed, doing some household chores and attending church weekly, were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. (R. at 284.) The ALJ further found that Mullins was apparently able to care for her young handicapped child at home, which is an undertaking inconsistent with the alleged severity of her impairment. (R. at 284.) While Mullins stated that her poor memory and irritability were the biggest impediments to working, a mental examination in October 1998 revealed that Mullins was fully oriented and alert and had a Global Assessment of Functioning, ("GAF"), of 70.[2] (R. at 193.) Furthermore, on December 27, 1998, B. Wayne Lanthorn, Ph.D., found Mullins appropriately oriented to all spheres and her memory processes intact. (R. at 261.) Lanthorn found Mullins to have a GAF of 60-65[3]. (R. at 264.) Mullins also claims disability, in part, based on her bronchial condition, but Mullins responds well to treatment with no residual functional limitations. (R. 145, 147-54, 156, 159-61, 163-69, 178-81.) Moreover,

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 represents some mild symptoms (depressed mood or mild insomnia) or some difficulty in social, occupational or school functioning, but generally functioning pretty well, and some meaningful interpersonal relationships. DSM-IV at 34.

[3]A GAF of 51-60 indicates "moderate symptoms...OR moderate difficulty in social, occupational or school functioning..." DSM-IV at 32.

Case 2:04-cv-00055-GMW-PMS Document 17 Filed 11/22/05 Page 16 of 18 Pageid#: 64

pulmonary function studies and chest x-rays have been completely normal. (R. at 183, 195, 197, 502.) Therefore, I find that the ALJ reasonably found that Mullins's subjective complaints of disabling functional limitations were not credible.

Mullins also argues that the ALJ erred by failing to consider the combined effect of Mullins's impairments, particularly the combined effect of her depression and anxiety, on her ability to work (Plaintiff's Brief at 6.) An ALJ must consider the combined effect of a claimant's impairment to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curium) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, "the ALJ must adequately explain his or her evaluation of the combined effect of impairments." *Reichenbach*, 808 F.2d at 312.

The court finds that the ALJ adequately considered the combined effect of all of Mullins's impairments on her ability to work. Contrary to Mullins's claim, the ALJ specifically addressed the combined effect of her depression and anxiety. (R. at 286.) The ALJ noted that even Dr. Page assigned Mullins with a GAF of 70, which indicated only mild symptoms. (R. at 286.) In addition, Lanthorn stated that Mullins responded appropriately to commonly used adages and was able to attend, concentrate and follow directions without difficulty. (R. at 286.) In consideration of Mullins's depression and anxiety, the ALJ limited Mullins to simple, repetitive, one-two-step tasks in a low-stress and nonsequential production environment with no exposure to crowds, infrequent exposure to the general public and occasional exposure to co-workers and supervisors. (R. at 286.) The ALJ further addressed

Mullins's osteopenia and bronchitis and adjusted her residual functional capacity accordingly. (R. at 285.) Therefore, I find that the ALJ properly considered the combined effect of Mullins's impairments on her ability to work.

*IV. Conclusion*

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED: This 18 day of November 2005.

*[signature]*

SENIOR UNITED STATES DISTRICT JUDGE